**GOODING v. WILLARD et al.**

Civ. No. 12734.

United States District Court
E. D. New York.

March 31, 1953.

William B. Hoffman, Mineda, N. Y., for plaintiff.

Frank J. Parker, U. S. Atty. Eastern District of New York, Brooklyn, N. Y., By: Nathan Borock, Asst. U. S. Atty., Brooklyn, N. Y., and W. E. Boote, Asst. Sol., Employees' Compensation Division, Washington, D. C., for defendant Deputy Commissioner.

Kirlin, Campbell & Keating, New York City, By: Thomas Coyne, New York City, of counsel, for defendants Atlantic Basin Iron Works and Aetna Casualty & Surety Co.

BYERS, District Judge.

These are three motions having the common object of testing the finality of an order denying to Evelyn Gooding, an award which she sought under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., by reason of the death of her husband, William Gooding, on March 13, 1950, at the age of 29.

The contested issue was whether his death resulted solely from heart failure resulting from rheumatic fever suffered at the age of 5 years, or if the pre-existing condition was quickened into an organic decline as the result of a fracture of the sixth rib which Gooding sustained when he tripped and fell over a cable strung on a ship's deck, at the close of his daily work on April 14–15, 1948.

The plaintiff's action is against the Deputy Commissioner, The Atlantic Iron Works, the employer of the decedent, and Aetna Casualty & Surety Company, its carrier. The first and third motions are for judgment of dismissal by the defendants, and the second is for a review of the proceedings before the Commissioner, 33 U.S.C.A. § 921, and a judgment setting aside his order of June 20, 1952 denying relief to the plaintiff.

There have been two claims involving the same subject matter. The first was heard on December 16, 1948 and February 8, 1949, wherein decedent himself was the claimant; that resulted in an order, dated April 4, 1949, adverse to him, on the ground that the disability which he then asserted was unrelated to the injury resulting from the fall. That record was received in bulk in connection with the widow's claim, and therefore constitutes an integral part of the voluminous record now before the court.

It contains, in addition to Gooding's own narrative and that of witnesses concerning the nature of his occupation as a welder and the happening of the accident, the testimony of his physicians, Doctors Sigmund

S. Breger and Joseph G. Terrence; also that of Dr. Malcolm M. Smith, who first examined the claimant for his employer or the carrier (as to which of the two the record is not clear), and Doctors 'John Hamilton Crawford, Louis F. Bishop, Shepard Shapiro and John J. Kennedy, all called by the carrier in opposition to the claim.

The upshot of the foregoing testimony was that Gooding was 5′ 10″ in height and weighed between 130 and 140 pounds during his adult years and was therefore of rather a slight build; he had been classified in 4F by the army in 1940 by reason of a heart murmur, and during the ensuing eight years had followed various occupations, some or all of which required of him the performance of strenuous manual labor. In 1944 he had consulted Dr. Breger for a generally rundown and nervous condition in connection with which an electrocardiogram was made, which the doctor said revealed a normal heart. There ensued twenty consultations during the year ended June 11, 1945, and professional advice for loss of weight; injections of liver and iron as a tonic were prescribed, but no treatment for a heart condition was required although the presence was recognized of a systolic murmur accompanied by a heart enlargement.

It also appears that Gooding was examined in about the month of 'January, 1948 preparatory to taking a job as a welder and was accepted; he functioned in that capacity until the happening of the accident. It also appears that he was called upon to carry weighty equipment from place to place, climb stairs, ladders, and do other heavy work.

To state the accident more in detail, he knocked off at about 12:30 A.M. April 15, 1948 and was carrying certain of his equipment with his right hand and arm, and a steel lunch box in his left hand, and when he tripped over the cable, he was thus prevented from breaking the fall by the use of hands or arms; when he struck the deck the lunch box inflicted the injury to the rib which has been described. He at once received first aid and later that morning he was examined by Dr. Smith, who did not discover the fracture, nor order an x-ray, nor strap the area involved. Gooding seemed to be complaining only of pain at the site of this injury and a leg bruise which was unimportant. At that time Dr.. Smith tested his heart and found that "he had a systolic blow with a presystolic rumble and a rather diffuse apex beat visible in the sixth interspace outside of the nipple line." He was asked:

"Q. Now, at that point, Doctor, was the man compensating or decompensating in your opinion? A. He was compensating." Decompensation means that the heart no longer maintains the circulation, according to the testimony.

On May 3rd Dr. Smith told the patient that he could resume work on the following day if he so desired, although apparently the doctor did not so certify until May 15th.

For present purposes, the critical time was the interval between the happening of the accident and May 4th, when Dr. Breger, Gooding's personal physician, prescribed digitalis, having then observed progress of decompensation on the part of Gooding's heart, which he said was slightly manifest three days earlier. His testimony will be referred to later.

If the findings made by the Deputy Commissioner had been specific as to the incidence of decompensation, upon which the entire issue turns, it would have been possible for the court to reach a conclusion as to whether the record as a whole presents substantial evidence to support the rejection of the claim upon the ground tersely stated that "The death of the employee was unrelated to the injury or his employment."

The history of the decedent from the time of the accident was epitomized in the order, in general accord with the testimony, and contains the recital "that at the time of the injury, the employee was 29 years of age and had a pre-existing rheumatic heart disease; that said rheumatic heart disease culminated in congestive heart failure and death on March 13, 1950 and was neither caused by nor aggravated by said injury or related to the employment."

Clearly the foregoing is correct to the extent that the congestive heart failure was not caused by the injury.

As to the aggravation of the rheumatic heart disease, the evidence seems to call for critical analysis, if the teaching of Universal Camera Corp. v. Labor Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, is reasonably understood. True the court was there dealing with the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., but the parallel between its requirements and those of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., which govern these orders, O'Leary v. Brown-Pacific-Maxon, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483, is so carefully expounded as to prescribe for any reviewing court of an administrative order, awareness of responsibility for the ultimate pronouncement which cannot be evaded by acquiescence in a labor saving presumption of validity. Not otherwise is the following language 340 U.S. on pages 488 and 489, 71 S.Ct. on page 465, presently understood:

"A formula for judicial review of administrative action may afford grounds for certitude but cannot assure certainty of application. Some scope for judicial discretion in applying the formula can be avoided only by falsifying the actual process of judging or by using the formula as an instrument of futile casuistry. It cannot be too often repeated that judges are not automata * * *."

In what is believed to be an attempt to meet the requirements thus stated, this entire record has been examined in the effort to ascertain whether the conclusion stated by the Deputy Commissioner is supported by substantial evidence.

It will be apparent that the finding of the Deputy Commissioner necessarily means that death would have come to Gooding when and as it did, had he not sustained the fall on April 15, 1948 and suffered the fractured rib, assuming of course no other intervening casualty. This for the reason that his pre-existing rheumatic heart condition was of such a nature that in a man of his physical characteristics, who followed the calling that he did, it may be thought that the culmination on March 13, 1950 was inevitable.

All of the professional testimony presented by the carrier necessarily boiled down to that, and it was impressive at least in bulk.

Also to be remembered is the fact that the Deputy Commissioner, having once denied Gooding's own application, naturally enough could have been inclined to follow the same course of decision in the widow's case in reappraising the testimony of the same professional witnesses when given for the second time.

The above stated concensus of medical testimony offered by the carrier must be examined in light of what the record shows concerning Gooding's condition prior to the accident, for surely if that played no part in the acceleration of a progressive organic decline, but was merely an uninfluential episode which did not affect an otherwise constantly developing condition, it should have been possible to point to certain physical manifestations compatible not only with a heart impaired by an attack of rheumatic fever some 22 years earlier, but also with its progressive degeneration.

One need not be a physician to realize that.

Of course it could be argued that the progressive aspect of the disorder fortuitously elected to set itself in motion for the first time about May 1st, 1948, sixteen days after the accident (when decompensation set in), rather than sooner, but if that is the Deputy Commissioner's view he has not so written; moreover the argument would be far fetched at best.

What is clearly known about Gooding's physical condition during the four months prior to the accident is that on January 15th, 1948 he was examined by the physician for the defendant, Atlantic Basin Iron Works, and found to be fit and able to work as a welder. That is, he was recommended for acceptance as a welder in the boiler department. That examination was made by a Dr. Krell whose card record shows: "Heart systolic murmur no signs of decompensation."

Elsewhere in the testimony appears the fact that it is part of a welder's occupation

to climb around various structures, and to use and carry heavy equipment.

Dr. Krell was not called by the defendant Atlantic Basin Iron Works to discredit his own record, or to otherwise detract from his said recommendation; it is fair to infer that on January 15th, 1948 he would have been able to observe a progressive deterioration in Gooding's heart, had it then been under way.

During the succeeding four months Gooding performed his customary tasks without incident, and there is no testimony to the contrary. A finding therefore by the Deputy Commissioner would have been appropriate to the effect that as of April 15th, 1948, no deterioration of the condition certified by Dr. Krell had been established, but no such finding was made; it is reasonable to infer therefore that Gooding was his normal self at the time of the injury here involved.

The next established datum is the incomplete examination of Gooding on the mid-morning of April 15th by Dr. Smith, and his testimony has been quoted above.

Apparently May 7th was the last day on which Dr. Smith saw him, and his statement was clearly to the effect that at none of these interviews after April 15th did Gooding complain of shortness of breath or heart pounding; also that there was nothing seen by Smith that would indicate to him that Gooding was decompensating, and that if he had observed such a condition he would not have certified as of May 15th that Gooding could return to work. There is one respect in which it is difficult to follow him concerning the heart condition that he said he discovered on April 15 above quoted; on cross-examination he was asked the following:

"Q. If you found that this man had the condition in his heart that you found on your examination would you have directed or advised him to do the type of work that he was doing as a welder? * * * A. In my opinion a man with the heart findings which were present on the day when I examined him should not be doing heavy work."

However he certified, as above stated, under date of May 15th, 1948 that Gooding was able to work as a welder, which creates a doubt as to whether the first examination was as thorough and revealing as he later described it; and further, whether he practically ignored its purported showing by later certifying Gooding for return to work. Moreover he said that on April 15th he did not take Gooding's blood pressure nor did he order an electrocardiogram or make a fluoroscopic examination, and he cannot say that he checked his pulse rate. It will be remembered of course that his preoccupation was with the chest injury as such.

These considerations cannot be ignored in appraising Smith's testimony that Gooding was compensating on April 15, 1948.

Bearing in mind that the present task is to expose evidence as to whether between April 15th and May 4th there was presented in Gooding's condition the showing of a progressive organic deterioration not related to the fracture of his sixth rib, it must be said that Dr. Smith's testimony is at best negative in that respect.

It is undisputed that Gooding sought the advice of Dr. Breger on or before April 19th when he was suffering pain, loss of sleep, and general distress as the result of the fall. Then it was that the doctor told him that since it was a compensation case, he should return to the Yard physician and insist upon an x-ray which as yet had not been ordered. That was done on the 20th, whereby the fracture was indeed revealed and Dr. Smith applied strapping, the conventional procedure for rib fracture.

Because he was still dissatisfied with his own progress, Gooding saw Dr. Breger on May 1st complaining as Breger said "of severe pounding of the precordial region"; on May 4th he saw the patient again "and began giving him digitalis because his pulse began going up and his blood pressure began going up and he was complaining bitterly."

Breger testified that the heart was then decompensating, which was the reason for the use of digitalis, but on that occasion the decompensation was very slight.

Since Breger's testimony was uncontradicted, it was either to be accepted as inherently probable, or rejected for the contrary reason.

Again there is no finding on this critical subject in the order under review.

It is necessary to pause sufficiently to refer to lay testimony as to the outward manifestations of Gooding's condition during these few days: His coworker Leone who observed the accident told how he had known Gooding for some months, and then as to the exact occurrence; also the way in which the welders worked, and the equipment that they carried and used. His testimony as to the nominal participation in the job on the part of Gooding after the accident, on April 15, 16 and 19 includes his observation that Gooding was weak and found it hard to breathe, he was gasping, although the witness would not say definitely that he had pain—"He found it difficult to breathe, I wouldn't say gasping." Also, "I saw his vein (left side of neck)."

Again the foregoing could have been rejected by the Deputy Commissioner in the exercise of his judgment, but it is still in the record unimpeached by cross-examination.

Some of the professional testimony was directed to the question of how soon after the accident decompensation could have been expected to show. There is an expectable difference of opinion, since the fractured rib, although 1.6 centimeters from the heart, did not actually strike the organ itself. So much is indeed clear, perhaps because there was no such breaking of the bone as to cause nonapposition of the broken ends, but whether there was a bowing induced by the fall does not appear, nor could anyone offer tutored speculation on the subject.

It is against this background that the medical testimony, most of it in the guise of expert opinion, must be assimilated without stopping to indicate whether it was given in connection with the hearings upon the first or second claim, since all doctors at the latter hearing adhered to their earlier views, with the exception of Dr. Crawford whose testimony is to be noted presently.

Those called by the carrier have been enumerated above. Dr. Crawford examined Gooding on September 23, 1948 in connection with the first claim. Dr. Bishop did not, nor did Dr. Shapiro, and their testimony was therefore clearly of the opinion variety. Dr. Kennedy, the Medical Examiner for the United States Bureau of Employee's Compensation, examined Gooding on August 4, 1948 in the line of his official duty. He said that from an examination of his report at the time he was testifying—which was some months later—he would say that the man was "not decompensating." He recommended procuring further reports from Dr. Breger. In his opinion decompensating did not occur until after Gooding had resumed his occupation on or about June 25, and carried it on for about four weeks, and that therefore Gooding's claim should be disallowed.

Dr. Crawford examined the claimant on September 16, 1948 at the request of the carrier, and made a report which is in evidence, and in which he wrote that if Gooding's statements to him were correct (as they seemed to be) that his symptoms only followed the accident, then in his opinion the accident precipitated the heart failure. He changed that opinion on the stand because Gooding did not tell him of working for about one month from June 25 in what is described as "light welding" from a seated position. It will be recalled that Dr. Smith had advised him of his fitness as at May 15. Also it should be stated that from May 4, Dr. Breger's advice, almost insistence, was to the contrary.

Dr. Crawford's opinion was opposed to Dr. Breger's as to the presence of decompensation, when the latter prescribed digitalis on that day, which was an indicated medication to mitigate the condition.

Since Dr. Breger saw and treated Gooding at the critical time, and Dr. Crawford did not, the former's testimony was obviously the better informed.

Recurring to the period between June 25 and July 25, Dr. Crawford testified in

answer to a question as to whether Gooding would be able to do light work even with a decompensating heart provided it was not decompensating to any great magnitude, "I should think if it was a very, very light job, if he didn't have too much of a decompensation he might get by."

Drs. Bishop and Shapiro gave purely opinion testimony in answer to extended hypothetical questions, and neither ever saw Gooding, and their opinions were that there was no causal relation between the accident and the condition which resulted in Gooding's death.

The delicate poise of the issue presented in this case, so far as the medical profession is at present advised, was perhaps unconsciously revealed by Dr. Shapiro in answer to a question as to whether, if a man was doing laborious work up to the time of the accident, it could be safely assumed that he had no cardiac decompensation, as follows:

"The variations from patient to patient are so great in diseases, and have such wide spread implications, such as have been discussed here, in which circulation is involved, that it would be a very poor practice to attempt to make this very broad general proposition applicable directly to a case such as the one being discussed here."

The foregoing seems to show, if that be needed, that the physician who had attended this man for years, and whose advice was sought hard upon the happening of April 15, was in the preferred position to note and state the observable physical manifestation of his patient's true condition. A persuasive excerpt from his testimony is:

"This boy was working as a welder, he was doing hard work, he was supporting his family, and he had no complaints, and I remember that he lived in a 5-story walkup where I refused to make any calls because I couldn't walk up those stairs, but he did a couple of times a day, and then suddenly he receives a severe painful injury to the chest. He is told there is nothing to do and he continues to work until he is completely exhausted and he became dyspnoeic and he was in pain, and from that time on the boy makes a progressive down-grade and finally death ensued."

Dr. Terrence was consulted by Gooding on October 23, 1948 for the purpose of making a report; he treated the patient and continued so to do at the time of the first hearing. He was of the opinion that there was a definite causal relationship between the accident and the heart condition which led to Gooding's death, since he had no known history of a cardiac condition with· the exception of a murmur which he said is a common thing and doesn't necessarily ·mean heart disease. Then came the accident, and as he stated the matter:

"Subsequently, the man never again had anything like the condition that he had prior to the accident; it was a case of going downhill gradually over a period of time, until his death in Kings County Hospital."

He based his opinion not upon the observation of a decompensating heart shortly after the accident but upon "the whole picture"; that there was a partial decompensation on the day of his first examination, and that decompensation could have set in two days, a week, or two weeks after the accident. He said:

"A decompensating heart can be an embarrassed heart. * * * but with some individuals, they might work with such a heart and be fully unaware of their status, particularly in a stubborn individual, who might continue to work" (in spite of shortness of breath and pounding of the heart).

■ A careful consideration of this highly technical record leaves the clear impression in the mind of the court that the probabilities point to a relationship between the accident which Gooding suffered on April 15, 1948, and his subsequent cardiac decline and death. A mere difference of opinion however with the Deputy Commissioner concerning the teachings of the testimony would not support a ruling adverse to his order. This has been held many times, and perhaps most recently in Anderson's case [Crescent Wharf & Warehouse Co. v. Cyr], 9 Cir., 200 F.2d 633.

If that were all, the duty of the court would terminate with the reflection that

the Deputy Commissioner saw and heard the witnesses (not however as to matters of fact), and that those called by the carrier supplied him with testimony consistent with his ruling. There is more however to the case than that:

There is no substantial proof that Gooding's condition subsequent to the accident, namely, the organic deterioration of his heart, was but the continuation of a pre-existing and continuous retrogression. The starting point of the inquiry on that subject is necessarily the examination of Gooding by Dr. Krell on January 15, 1948 (who was not called by the carrier) and nothing intervened between then and the examination by Dr. Breger around May 1, other than the accident itself. The natural and probable explanation of the condition then revealed was not to be sought in hypothetical possibilities, but from what had taken place. The effort to do so, while supportable perhaps by the theories of nonexamining witnesses called to sustain interested opposition to the claim, was not as convincing as the happening itself and the physical conditions which it brought about as observed by the attending physician; he of course had no duty to consider apart from that which he owed to his patient.

Perhaps the Deputy Commissioner felt free to choose between the testimony of Dr. Smith and of Dr. Breger. The result of the court's study of their direct and cross-examinations, as illuminated by the professional testimony of the other witnesses, has not revealed any necessary conflict between them however; it seems that if due weight be given to what each of them said, it merely results that Dr. Smith's preoccupation with an accident case to a workman may explain first his failure to procure an x-ray at once, and again his unawareness that special consideration of a possible cardiac involvement might be appropriate.

In any case, Dr. Breger's testimony as to conditions on May 1 and May 4 seem to have been ignored, and under the circumstances it follows in the considered judgment of this court that there is a lack of substantial evidence as contrasted with the testimony of the attending physician to support the order of the Deputy Commissioner; accordingly it will be set aside.

The first and third motions will be denied, and the second motion will be granted.

Settle order.